Gretchen M. Nelson (State Bar No.112566)
Carlos F. Llinas Negret (State Bar No. 284746)
**NELSON & FRAENKEL LLP**
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Tel.: 213-622-6469
Fax: 213-622-6019
Email: gnelson@nflawfirm.com
Email: cllinas@nflawfirm.com

Attorneys for Plaintiff

**UNITED STATES DISTRCT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| LAURA TEMPLE,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ACTION WATER SPORTS OF INCLINE VILLAGE, LLC; GARY SCOTT; DAVID CERUTI; E.B.; MICHAEL GOODWIN; ZAKARIA STOUR; SHAWN WILLETTE; BRENDA POOT; and DOES 1 through 100,<br><br>　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, LAURA TEMPLE, brings this action against Defendants ACTION WATER SPORTS OF INCLINE VILLAGE, LLC, GARY SCOTT, DAVID CERUTI, E.B., MICHAEL GOODWIN, ZAKARIA STOUR, SHAWN WILLETTE, BRENDA POOT, and DOES 1 through 100, and alleges as follows:

**INTRODUCTION**

1. This is an action for personal injuries arising from a boating incident that occurred on Lake Tahoe in an area near Chimney Beach Cove which is located within Carson City County, Nevada. On or about August 4, 2020, Plaintiff LAURA TEMPLE was on Lake Tahoe boating and tubing with colleagues she knew through her employment and other friends. The group of five

individuals (hereinafter the "GROUP") were on a boat rented to them by Defendant ACTION WATER SPORTS OF INCLINE VILLAGE, LLC.  While Plaintiff was swimming near the boat, the boat began drifting close to shore and defendant ZAKARIA STOUR who was resting on the ladder of another boat in the area, instructed one of the GROUP on how to start the motor and pull back on the throttle lever.  When the throttle lever was pulled back, it put the boat in reverse causing the boat to run over Plaintiff, causing her severe injuries and resulting in her being airlifted by helicopter for emergency medical treatment.

## **THE PARTIES**

2. Plaintiff LAURA TEMPLE is a resident of the County of San Francisco, California.

3. Defendant ACTION WATER SPORTS OF INCLINE VILLAGE, LLC ("ACTION WATER SPORTS") was and is a limited liability corporation with offices located in Incline Village, Nevada.  One of the members of Action Water Sports, DAVID CERUTI is a resident of Tahoe Vista, California.  All staff members, staff persons, and staff personnel, including but not limited to Defendant E.B. known only by his initials, mentioned herein were employees or agents of ACTION WATER SPORTS, DAVID CERUTI and GARY SCOTT and were acting within the scope of their employment or authority.  ACTION WATER SPORTS, DAVID CERUTI, GARY SCOTT, E.B. and all staff members, staff persons and staff personnel are collectively referred to herein as the "RENTAL DEFENDANTS."

4. Defendant GARY SCOTT, is one of the members of and one of two managers of ACTION WATER SPORTS.  On information and belief, SCOTT resides in Incline Village, Nevada and is a citizen of the State of Nevada.

5. Defendant DAVID CERUTI, is one of the members of and one of two managers of ACTION WATER SPORTS.  On information and belief CERUTI resides in Tahoe Vista, California and is a citizen of the State of California.

6. Defendant E.B., known only by his initials is and was an employee of Defendant ACTION WATER SPORTS, and on information and belief is a resident and citizen of California.  Once E.B.'s name is known, Plaintiff will amend this complaint to state his name in full.

7. Defendant MICHAEL GOODWIN, was a resident of California at the time of the incident and on information and belief is now a resident of the State of New York.

8. Defendant ZAKARIA STOUR, was a resident of the County of Los Angeles, California at the time of the incident and on information and belief is now a resident and citizen of Massachusetts.

9. Defendant SHAWN WILLETTE, was and is a resident and citizen of the County of Los Angeles, California.

10. Defendant BRENDA POOT, was and is a resident and citizen of the County of Los Angeles, California.

11. Plaintiff does not know the true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff is informed and believes that each of the Doe Defendants was in some manner legally responsible for the damages alleged below. Plaintiff will amend this Complaint to set forth the true names and capacities of these Defendants when ascertained, along with appropriate charging allegations.

12. Plaintiff is informed and believes, and thereupon alleges, that each of Defendants designated herein as a Doe is responsible in some actionable manner for the events and happenings referred to herein, and caused injuries to Plaintiff, as hereinafter alleged, either through said Defendants' conduct, or through the conduct of their agents, servants, employees. Where applicable, the term "Defendant" or "Defendants" includes both the named Defendants and Defendants sued under the fictitious names of Does 1 through 100, inclusive.

13. Plaintiff is informed and believes and therefore alleges that, at all times relevant to this action, Defendants, and each of them, were the agents, servants, employees, assistants, and consultants of each of their co-Defendants, and were, as such, acting within the course of and scope of the authority of their agency and employment, and that each and every Defendant when acting as a principal, was negligent and careless in the selection and hiring of each and every co-Defendant as an agent, servant, employee, assistant and/or consultant.

**VENUE**

14. Venue is appropriate in the Eastern District of California pursuant to 28 U.S.C. §1391. In particular, pursuant to §1391(b), a civil action may be brought in (2) a judicial district in which a substantial part of the events or missions giving rise to the claim occurred."

**SUBJECT MATTER JURISDICTION**

15. This Court has jurisdiction over Plaintiffs' claims under the maritime and admiralty jurisdiction of the Court, pursuant to Article III, §2 of the United States Constitution, delegating jurisdiction over admiralty cases to the federal courts, and 28 U.S.C. §1333.

16. Federal admiralty jurisdiction extends to all navigable waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable. The term 'navigable waters' means a body of water which, in its present configuration, constitutes a highway of commerce, between the states or with foreign countries. See *Complaint of Paradise Holdings, Inc.*, 795 F.2d 756 (9th Cir. 1986) ("To invoke federal admiralty jurisdiction in tort cases, the tort must occur on navigable waters and bear a significant relationship to traditional maritime activity.").

17. At all times relevant and material, the incident giving rise to Plaintiff's injuries occurred on a navigable waterway of the United States (Lake Tahoe), during traditional maritime activity.

18. To the extent that this Court has jurisdiction pursuant to 28 U.S.C. §1333, the Plaintiffs have the same substantive and Constitutional rights they would enjoy in California Superior Court, including the right to a jury trial. See *DeRoy v. Carnival Corporation*, 936 F.3d 1302 (11th Cir. 2020) ("As we have noted, § 1333 vests district courts with original jurisdiction over civil admiralty or maritime disputes, but the statute 'saves to suitors'—meaning plaintiffs—'all other remedies to which they are otherwise entitled.' … The Supreme Court … has nonetheless concluded that the saving to suitors' clause reserves remedies and the concurrent jurisdiction of state courts over some admiralty and maritime claims. One remedy the saving-to-suitors clause safeguards is the right to a jury trial."). See also *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 444 (2001).

**PERSONAL JURISDICTION**

19.  Defendants, at all times material hereto, personally or through an agent:

    a.  Maintained their principal place of business in this state and county;

    b.  Operated, conducted, engaged in or carried on a business venture in this state and or county; and/or;

    c.  Were engaged in substantial activity within this state; and/or

    d.  Operated vessels in the waters of this state; and/or

    e.  Purposefully availed themselves of the benefits of conducting activities in California by directing its activities toward this state, thereby obtaining the benefits and protections of this state's laws.

**GENERAL ALLEGATIONS**

20.  During the summer of 2020, Plaintiff who resided in San Francisco and worked for Hyatt in San Francisco was transferred during the COVID 19 pandemic to work for a temporary period of time estimated to be 3 to 4 months in the Lake Tahoe area at the Hyatt Hotel in Incline Village. She had been in Lake Tahoe for about 45 days and STOUR and POOT who also were transferred to work temporarily at the Hyatt Hotel had been in Lake Tahoe for approximately two weeks. STOUR and POOT also were to remain in Lake Tahoe for more than 60 days working at the Hyatt in Lake Tahoe. Plaintiff and her work colleagues and two other colleagues who worked for Hyatt in Los Angeles and were visiting Lake Tahoe decided to rent a motorboat for the morning of August 4, 2020, to go swimming or tubing on Lake Tahoe. (Plaintiff, GOODWIN, STROUP, WILLETTE and POOT are referred to herein collectively as the "GROUP".)

21.  One member of the GROUP, Defendant ZAKARIA STOUR made a reservation by telephone with employees of ACTION WATER SPORTS to rent a motorboat capable of holding 5 people for the morning of August 4, 2020. STOUR told the individual with whom he spoke that he did not know how to operate a motorboat and requested that he be provided with sufficient instruction to make certain that he could operate the boat safely. The boat that ACTION WATER

1  SPORTS rented to the GROUP was a 21' 2001 Cobalt motorboat with a 220-horsepower engine.
2  The total for the half-day rental was $450.00.

3    22.    The GROUP intended to motor around the lake and to visit Emerald Bay which is
4  located in California.

5    23.    On the morning of August 4, 2020, the GROUP arrived at the RENTAL
6  DEFENDANTS' marina in Incline Village, Nevada.

7    24.    Defendant STOUR completed the rental process while the others waited. The
8  paperwork was comprised of a 1-page Rental Contract (with writing on the front and back) which
9  identified STOUR as the lessee at the top of the form. In the section of the Rental Contract entitled
10  Lessee's Signature, STOUR's name appears with an X next to it and below STOUR's name the
11  following names were written with each of the individual's ages next to the name: "Laura Temple,
12  Mikey Goodwin, Shawn Willette, Jason Guan." The names were not written by any of the GROUP
13  and none of the GROUP signed the Rental Contract. Moreover, Jason Guan was not in attendance
14  on the date of the accident and never boarded the boat. Defendant POOT is not identified on the
15  Rental Contract.

16    25.    STOUR signed a second document entitled "Boat Check Out."

17    26.    There was an additional document entitled "Action Watersports of Incline Village
18  LLC Customer Agreement & Understanding -- Rules and Regulations. At the end of the one-page
19  document it states: "I have read and understand the above rules and regulations." There are five
20  signatures at the bottom of the document including signatures by STOUR, POOT, WILLETTE,
21  GOODWIN and Plaintiff. The only information set forth in the document is the following:

22  Make sure there are properly fitting U.S. Coast Guard approved life jackets for EACH
person on board the boat. Children 12 and under must wear the life jacket <u>at all times</u>
23  when under way.

24  When leaving or approaching the pier, you must go SLOWLY in the harbor area.

25  RESTRICTED AREAS: Stay out of light colored water. Light green or brown means
26  SHALLOW! – Boating is permitted in the greenish blue and dark blue waters only.

27  DO NOT take boat on any beaches. Do not go into swimming areas marked by buoys or
"barber" poles.
28

> According to TRPA regulations, you must not go more than 5 mph when within 600 feet of shore.
>
> When entering/leaving Emerald Bay, be sure to go between the RED and GREEN buoys. There are rocks on both sides of the buoys which can be damaging to both you and the boat.
>
> Emerald Bay is limited to 15 MPH!
>
> Always sit down in the seats while the boat is underway—NOT on the TOP of the seats, decks, or sides of the boat. You are subject to a charge if seats are damaged from sitting on the seat backs!
>
> If you need to buy gas elsewhere, make sure it is regular unleaded. You need only buy enough gas to get you safely back, but any extra gas is at your expense.
>
> Keep a sharp lookout for other boaters and hazardous situations. STAY AWAY AT ALL TIMES FROM THE TAHOE QUEEN AND THE MS DIXIE PADDLE WHEEL BOATS OR ANY OTHER LARGE VESSEL. The wake from these boats is very dangerous!
>
> Our Dock Attendants will show you the propeller before you leave and when you return. If there is any damage you will be responsible, and will be charged for repair or replacement. If something goes wrong on your boat, you are the captain-you are responsible. You are also responsible for any damage to the boat, including but not limited to the hull, propeller, outdrive, interior, and any additional equipment rented; while it is in your care and custody.
>
> Drinking and driving is prohibited.
>
> ANYONE GOING INTO THE WATER IS REQUIRED TO WEAR A US COAST GUARD APPROVED LIFE VEST.
>
> BE CAREFUL AND HAVE A GOOD TIME!!!!!!

27. Defendant STOUR who had last been on a motorboat when he was 11 years old, was taken to the dock where the boat was moored and provided with 5-minutes of instruction on how to turn the motor on and off and how to use the throttle and steering wheel. Other than the document identified in paragraph 26 above, he was not provided with information on boating laws nor informed about any issues regarding boating when swimmers were in the water.

28. STOUR was never asked where he resided and he was never asked to sign an "affidavit" confirming that (1) he had either successfully completed a course in safe boating approved by the National Association of State Boating Law Administrator or passed a proficiency examination; or (2) he possessed a license to operate a vessel issued for maritime personnel by the U.S. Coast Guard; or (3) he was not a resident of Nevada and was temporarily using interstate waters for a period not to exceed 60 consecutive days and satisfied any applicable requirements of his state of residency relating to the operation of a motorboat. Rather he was simply asked his age which at the time was 26.

29. None of the others in the group of friends and colleagues was asked to provide an affidavit nor were they provided with any instructions on how to operate the boat.

30. At the dock, an employee of ACTION WATER SPORTS, Defendant "E.B." took Defendant STOUR on the boat and showed him how to use the throttle and how to turn the engine on and how to steer. No instructions were provided to the others who were told to wait on the dock.

31. The boat was not equipped with an anchor and no one ever advised as to any safety issues including the location of a first aid kit, that the vessel had an orange flag to be placed in the water in the vicinity of someone swimming, or that the absence of the anchor could cause the boat to drift into the shore. At no time did the RENTAL DEFENDANTS instruct or explain to any of the GROUP how to safely operate the motorboat.

32. Following the brief presentation to Defendant STOUR, the GROUP departed the marina and entered the lake to begin their recreational boating activities. At some point the GROUP wound up with the motorboat near Chimney Beach Cove where the engine was turned off and the boat allowed to drift. STOUR and GOODWIN swam toward the shore where they were jumping off the rocks into the water. Plaintiff, WILLETTE and POOT remained on board the boat.

33. While STOUR and GOODWIN were swimming near the shore, Plaintiff and WILLETTE got off the boat and Plaintiff got onto a tube raft rented to them by the RENTAL

DEFENDANTS. She was on the raft on the starboard side of the boat. WILLETTE got off and went swimming and returned to the boat after about 6-7 minutes. Plaintiff remained on the tube raft for about 10 minutes and then decided to go swimming on the starboard side of the boat.

34. At some point STOUR and GOODWIN started swimming back to the boat which was beginning to drift toward the shore. While they were swimming back to the boat, STOUR tired and stopped to rest hanging on the ladder of another boat anchored in the area. When GOODWIN got to the boat, he and WILLETTE and POOT were concerned that the boat was drifting too close to the shore and called out to STOUR. STOUR hollered directions to GOODWIN on how to start the boat. One of the GROUP either GOODWIN or WILLETTE started the engine and pulled back on the throttle which put the boat into reverse. As the boat began to travel in reverse, the back of the boat began to turn to the right and head towards Plaintiff. Plaintiff tried to swim away but she was sucked into the propeller area where she sustained severe and substantial injuries to her right leg and right arm and was pulled under the boat where she feared she would drown.

35. Hearing screams from POOT, GOODWIN cut the engine and jumped into the water to assist Plaintiff. A nearby paddleboarder and a kayaker came over and assisted in getting Plaintiff onto the paddleboard where they then took her to the shore. There an off-duty EMT assisted in wrapping her leg to slow the bleeding and paramedics arrived and placed Plaintiff into a helicopter where she was flown to Renown Medical Center in Reno, Nevada. She was taken into surgery at 4:00 p.m. to surgically repair multiple severe large lacerations on her right leg from below the knee up to her buttock and a severe laceration to her right arm.

**FIRST CAUSE OF ACTION**

**FOR NEGLIGENCE**

**(Against the RENTAL DEFENDANTS and Does 1 through 75)**

36. Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs above as though alleged originally herein.

37. At all times material, Defendants had a duty to provide a safe vessel that was fit for its intended purpose of recreating on a waterway and that it was equipped with all necessary equipment and that equipment was in good operating order. Defendants also had a duty to ensure that its customers and users are able to competently and safely operate recreational boats and any equipment provided with the boats. Defendants further had a duty to provide their customers and users with adequate instructions and safety briefings to ensure they would be prepared to safely operate the recreational boats rented by them. This duty included instruction on how to safely operate the boat in areas where swimmers are present and how to safely approach passengers who are in the water and ready to re-board and warn them of the known dangers associated with boating in an area where swimmers are present. Defendants breached their duty of care by failing to provide a vessel that was fit for its intended purpose by, among other things, failing to ensure that the boat was equipped with an anchor to prevent it from drifting near to shore and a boat that was properly functioning. The Defendants further breached their duty of care by, among other things, failing to properly instruct the GROUP on how to safely operate the rental boat and how to operate the boat safely and competently in an area where swimmers are present and to warn them of the known dangers associated with that activity.

38. Defendants had a duty to instruct their customers and users to appoint a lookout near the rear or "stern" of the boat to maintain a clear line of sight with the engine's propellers to alert the operator of any danger. Defendants breached this duty by failing to instruct the GROUP to adopt these precautions. Further, Defendants had a duty to instruct their customers and users to place a floatation device with an orange flag in waters where swimmers were present to alert the operator to the presence of a swimmer in the water.

39. Defendants had a duty to determine an awareness zone for the boat and to instruct their customers and users to take care that no passenger or swimmer came into this awareness zone while in the water unless the engine is turned off, the boat has stopped moving, and the operator has counted to ten to give the propellers time to stop moving. Defendants breached this duty by failing to instruct the GROUP to adopt these precautions.

40. Plaintiff relied on the Defendants' professional skill and experience to provide a safe, seaworthy vessel, fit for its intended use for watersports and the necessary safety and instructional training to ensure she and the other members of the GROUP were prepared to safely and competently operate the recreational boat and equipment supplied to the GROUP by the Defendants.

41. As a direct and proximate result of Defendants' breach of the aforementioned duties and other duties, Plaintiff suffered devastating physical, mental and psychological injuries all to her economic and general damage in an amount to be determined according to further proof.

42. As a result of the acts and omissions of Defendants, Plaintiff was injured in her health, strength, activity, and everyday well-being. She sustained injuries to her body, shock and injury to her person, and physical pain and suffering, all of which injuries have caused, and continue to cause Plaintiff to suffer damages including, but not limited to, pain, suffering, in an amount to be determined according to proof at trial. As a further legal result of the acts and omissions of Defendants, Plaintiff was required to, did employ, and may employ in the future physicians, surgeons, and other individuals/entities to examine, treat, and care for her, and did and will incur medical and incidental expenses all in an amount according to proof.

43. As a further legal result of the acts and omissions of Defendants, Plaintiff incurred other economic loss including loss of past and future earnings in an amount according to proof.

**SECOND CAUSE OF ACTION**

**FOR VIOLATIONS OF NEVADA REVISED STATUTE 488.730**

**(Against the RENTAL DEFENDANTS and Does 1 through 75)**

44. Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs above as though alleged originally herein.

45. At all times material, Defendants had a duty to ensure that they complied with the provisions of Nevada Revised Statute ("NRS") 488.730 which imposes duties on persons engaged in the business of renting or leasing motorboats.

46. NRS 488.730, subdivisions 3 and 5 provide in pertinent part that:

      3. A person or an agent or employee of a person engaged in the business of renting or leasing motorboats for operation on the interstate waters of this State shall not rent or lease a motorboat that has motor which exceeds 15 horsepower to any person born on or after January 1, 1983, for operation on the interstate waters of this State unless the person:

    (a) Is 18 years of age or older; and

    (b) Signs an affidavit that the person:

        (1) Has successfully completed a course in safe boating that is approved by the National Association of State Boating Law Administrators or has passed a proficiency examination that was proctored and tests knowledge of the information included in the curriculum of such a course;

        (2) Possesses a license to operate a vessel issued for maritime personnel by the United States Coast Guard pursuant to 46 C.F.R. Part 10 or an equivalent license issued by the Canadian Coast Guard; or

        (3) Is not a resident of this State, is temporarily using the interstate waters of this State for a period not to exceed 60 consecutive days and satisfies any applicable requirements of the person's state of residency or province relating to the operation of a motorboat

\*\*\*

      5.   A person or an agent or employee of a person engaged in the business of renting or leasing motorboats for operation on the interstate waters of this State shall provide to each authorized operator of a motorboat a summary of the statutes and regulations governing the operation of a motorboat and instructions regarding the safe operation of the motorboat. Each person who is listed as an authorized operator of the motorboat shall review the summary of the statutes, regulations and instructions before the motorboat departs from the rental or leasing office.

    47.   The motorboat rented to STOUR and the GROUP had an engine with 220 horsepower.

48. The motorboat rented to STOUR and the GROUP was intended to be used in the interstate waters of Lake Tahoe, including Nevada and California and Defendants knew that the vessel would be used both in Nevada and California waters.

49. Defendants and each of them failed to obtain the affidavit required under NRS 433.80, subdivision 3 from anyone in the GROUP and further failed to confirm whether any of the GROUP were residents of Nevada or of another state, and if a resident of another state the length of time that the individual was staying in Nevada and further failed to confirm the requirements in any of the GROUP's state of residency relating to the operation of a motorboat.

50. Defendants and each of them failed to provide the summary of all of the relevant the statutes and regulations governing the operation of a motorboat and instructions regarding the safe operation of the motorboat in violation of NRS 433.80, subdivision 5.

51. Plaintiff relied on the Defendant's professional skill and experience to ensure compliance with Nevada laws with respect to operation of a motorboat.

52. As a direct and proximate result of Defendants' breach of the aforementioned duties and violation of the laws, Plaintiff suffered devastating physical, mental and psychological injuries all to her economic and general damage in an amount to be determined according to further proof.

53. As a result of the acts and omissions of Defendants, Plaintiff was injured in her health, strength, activity, and everyday well-being. She sustained injuries to her body, shock and injury to her person, and physical pain and suffering, all of which injuries have caused, and continue to cause Plaintiff to suffer damages including, but not limited to, pain, suffering, in an amount to be determined according to proof at trial. As a further legal result of the acts and omissions of Defendants, Plaintiff was required to, did employ, and may employ in the future physicians, surgeons, and other individuals/entities to examine, treat, and care for her, and did and will incur medical and incidental expenses all in an amount according to proof.

54. As a further legal result of the acts and omissions of Defendants, Plaintiff incurred other economic loss, including past and future earnings, in an amount according to proof.

## THIRD CAUSE OF ACTION

## FOR NEGLIGENCE AGAINST DEFENDANTS STOUR, GOODWIN, WILLETTE, POOT AND DOES 76 THROUGH 100

55. Plaintiff re-alleges, adopts, and incorporates by reference the allegations in paragraphs above as though alleged originally herein.

56. Defendants had a duty to safely operate the boat.

57. Defendants breached this duty by failing to maintain their attention on Plaintiff at all times while she was in the water, by failing to maintain a proper lookout while Plaintiff was in the water, and by starting the engine and putting the boat in reverse when Plaintiff was in the water without having an understanding of her location.

58. Defendants' breaches of their duties of care directly and proximately caused Plaintiff to suffer devastating physical, mental, psychological injuries all to her economic and general damage in an amount to be determined according to proof.

59. As a result of the acts and omissions of Defendants, Plaintiff was injured in her health, strength, activity, and everyday well-being. She sustained injuries to her body, shock and injury to her person, and physical pain and suffering, all of which injuries have caused, and continue to cause Plaintiff to suffer damages including, but not limited to, pain, suffering, in an amount to be determined according to proof at trial. As a further legal result of the acts and omissions of Defendants, Plaintiff was required to, did employ, and may employ in the future physicians, surgeons, and other individuals/entities to examine, treat, and care for her, and did and will incur medical and incidental expenses all in an amount according to proof.

60. As a further legal result of the acts and omissions of Defendants, Plaintiff incurred other economic loss, including past and future earnings, in an amount according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For past and future general damages in a sum in excess of the minimum jurisdiction limits of the Court, according to proof;
2. For past and future medical, incidental and special damages according to proof;
3. For past and future loss of earnings and loss of earnings capacity according to proof;
4. For prejudgment interest to the extent allowed by law;
5. For costs of suit incurred herein; and
6. For such other and further relief as the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff hereby requests and demands a trial by jury on all claims so triable.

Date: April 21, 2023.

BELJAJEV LAW GROUP, PC

NELSON & FRAENKEL, LLP

By:/*s/Carlos F. Llinás Negret*
Gretchen M. Nelson
Carlos F. Llinás-Negret
*Attorneys for Plaintiff*